## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THOMAS HALIBURTON, Derivatively on Behalf of Nominal Defendant PAYPAL HOLDINGS, INC.,

Plaintiff,

v.

JAMES ALEXANDER CHRISS, JAMIE S. MILLER, FRANK KELLER, DIEGO SCOTTI, JOY CHIK, JONATHAN CHRISTODORO, CARMINE DI SIBIO, DAVID W. DORMAN, ENRIQUE LORES, GAIL J. MCGOVERN, DEBORAH M. MESSEMER, DAVID M. MOFFETT, ANN M. SARNOFF, DEIRDRE STANLEY, FRANK D. YEARY, RODNEY ADKINS, JOHN DONAHOE, and BELINDA JOHNSON,

Defendants,

and

PAYPAL HOLDINGS, INC.,

Nominal Defendant.

C.A. No.

**JURY TRIAL DEMANDED**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Thomas Haliburton ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant PayPal Holdings, Inc. ("PayPal" or the "Company") and against certain current and former officers and directors of the Company for violations of section 14(a) of the Exchange Act, contribution under section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act, breaches of fiduciary duties, unjust enrichment, abuse of control, and gross

1

mismanagement. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by PayPal and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on PayPal's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related securities fraud class action lawsuit captioned (the "Related Securities Action"); and (e) review of other publicly available information concerning PayPal and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant PayPal against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately February 8, 2024, to the present (the "Relevant Period").[1]

2.      PayPal is a digital payments company whose products and services are designed to facilitate transactions between individuals, businesses, and retailers both online and in-person. PayPal provides specialized services catered towards both consumers and merchants, including the Company's "Branded Checkout" segment which is comprised of services under the brands

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 8, 2024 to February 2, 2026; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

2

PayPal and Venmo. The Branded Checkout services are designed with the goal of facilitating a faster and easier checkout process when customers make digital purchases.

3. In order to generate revenue, PayPal charges fees to those who complete transactions using its platforms. These fees are generally based on the volume of activity on the given platform used to facilitate a particular transaction.

4. Throughout the Relevant Period, the Defendants touted substantial improvements to its Branded Checkout segment that were supposed to generate sustainable growth for the segment and the Company. Instead, PayPal experienced severe execution issues with the Branded Checkout segment which undermined growth. Defendants concealed these issues from the investing public until the truth was revealed on February 3, 2026, when the Company disclosed poor performance of its Branded Checkout segment and announced the termination of then-CEO Alex Chriss. PayPal attributed the poor performance of the Branded Checkouts segment to "operations and deployment issues" across all regions.

5. In addition, the Individual Defendants caused the Company to repurchase its own stock at artificially inflated prices throughout the Relevant Period. In all, the Company repurchased ***161.1 million*** shares of its own stock for an aggregate cost of approximately ***$11 billion*** between March 2024 and December 2025. All told, the repurchases made during the Relevant Period caused the Company to overpay approximately ***$4.3 billion*** for its own stock, causing substantial harm to the Company as a result.

6. The market reacted negatively to this news, Causing PayPal's stock price to plummet by over 20% per share from $52.33 per share down to $41.70 per share on February 3, 2026.

**JURISDICTION AND VENUE**

7.    This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

8.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

9.    Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

**PARTIES**

A.    **Plaintiff**

10.    Plaintiff was a shareholder prior to the start of the Relevant Period, is currently, and has continuously been, a holder of PayPal common stock.

B.    **Nominal Defendant**

11.    Nominal Defendant PayPal is incorporated in Delaware and its current principal executive offices are located at 2211 North First Street, San Jose, California, 95131. The Company's common stock trades on the NASDAQ under the ticker symbol "PYPL".

C.    **Defendants**

12.    Defendant James Alexander Chriss ("Chriss") served as the President and Chief Executive Officer ("CEO") of PayPal and was a member of the Company's Board of Directors (the "Board") between September of 2023 and February 2, 2026. For the fiscal years of 2024 and

4

2025, Chriss received \$6,658,527 and \$25,243,486 in total compensation, respectively.[2] Defendant Chriss is named as a defendant in the Related Securities Action.

13.    Defendant Jamie S. Miller ("Miller") has served as the Chief Financial Officer ("CFO") and Executive Vice President since January of 2025. Miller also served as the Company's Interim President and CEO between February 2, 2026 and March 1, 2026. For the fiscal years of 2024 and 2025, Miller received \$12,995,304 and \$14,034,200 in total compensation, respectively. Defendant Miller is named as a defendant in the Related Securities Action.

14.    Defendant Frank Keller ("Keller") has served as the Executive Vice President and General Manager of the Company's Large Enterprise & Merchant Platform Group since April of 2024. For the fiscal year of 2025, Keller received \$13,032,004 in total compensation. Defendant Keller is named as a defendant in the Related Securities Action.

15.    Defendant Diego Scotti ("Scotti") has served as the Executive Vice President and General Manager of the Company's Consumer Group and of the Global Marketing & Communications Group since September of 2023. For the fiscal years of 2024 and 2025, Scotti received \$17,281,842 and \$13,032,004 in total compensation, respectively. Defendant Scotti is named as a defendant in the Related Securities Action.

16.    Defendants Chriss, Miller, Keller, and Scotti are collectively referred to herein as the "Securities Action Defendants".

17.    Defendant Joy Chik ("Chik") has been a member of the Board since March of 2025. Defendant Chik is a member of the Compensation Committee. For the fiscal year of 2025, Chik received \$420,544 in total compensation.

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

18.    Defendant Jonathan Christodoro ("Christodoro") has been a member of the Board since July of 2015. Defendant Christodoro is a member of the Audit and Finance Committee ("Audit") Committee and the Compensation Committee. For the fiscal years of 2024 and 2025, Christodoro received $383,004 and $393,489 in total compensation, respectively.

19.    Defendant Carmine Di Sibio ("Di Sibio") has been a member of the Board since July of 2024. Defendant Di Sibio is the Chair of the Audit Committee. For the fiscal years of 2024 and 2025, Di Sibio received $296,046 and $395,956 in total compensation, respectively.

20.    Defendant David W. Dorman ("Dorman") serves as the Chairman of the Board and has been a member of the Board since June of 2015. For the fiscal years of 2024 and 2025, Dorman received $390,057 and $400,588 in total compensation, respectively.

21.    Defendant Enrique Lores ("Lores") has been a member of the Board since June of 2021, previously served as Chairman of the Board between July 23, 2024 and February 2, 2026, and currently serves as the President and CEO of the Company as of March 1, 2026. For the fiscal years of 2024 and 2025, Lores received $486,324 and $530,101 in total compensation, respectively.

22.    Defendant Gail J. McGovern ("McGovern") has been a member of the Board since June of 2015. Defendant McGovern is the Chair of the Corporate Governance and Nominating Committee and is a member of the Audit Committee. For the fiscal years of 2024 and 2025, McGovern received $393,004 and $403,490 in total compensation, respectively.

23.    Defendant Deborah M. Messemer ("Messemer") has been a member of the Board since January of 2019. Defendant Messemer is a member of the Audit Committee and the Corporate Governance and Nominating Committee. For the fiscal years of 2024 and 2025, Messemer received $375,004 and $380,257 in total compensation, respectively.

24.     Defendant David M. Moffett ("Moffett") has been a member of the Board since June of 2015. Defendant Moffett is a member of the Audit Committee. For the fiscal years of 2024 and 2025, Moffett received $395,004 and $405,490 in total compensation, respectively.

25.     Defendant Ann M. Sarnoff ("Sarnoff") has been a member of the Board since June of 2017. Defendant Sarnoff is a member of the Corporate Governance and Nominating Committee. For the fiscal years of 2024 and 2025, Sarnoff received $375,061 and $384,433 in total compensation, respectively.

26.     Defendant Deirdre Stanley ("Stanley") has been a member of the Board since June of 2025. Defendant Stanley is a member of the Corporate Governance and Nominating Committee. For the fiscal year of 2025, Stanley received $318,013 in total compensation, respectively.

27.     Defendant Frank D. Yeary ("Yeary") has been a member of the Board since July of 2015. Defendant Yeary is the Chair of the Compensation Committee and is a member of the Audit Committee. For the fiscal years of 2024 and 2025, Yeary received $375,061 and $384,512 in total compensation, respectively.

28.     Defendant Rodney Adkins ("Adkins") served as a member of the Board until June 2025. For the fiscal years of 2024 and 2025, Adkins received $385,004 and $110,000 in total compensation, respectively.

29.     Defendant John Donahoe ("Donahoe") served as Chairman of the Board until July 2024. For the fiscal year of 2024, Donahoe received $530,046 in total compensation.

30.     Defendant Belinda Johnson ("Johnson") served as a member of the Board until May 2024. For the fiscal year of 2024, Johnson received $100,057 in total compensation.

7

31.     Defendants Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, Yeary, Adkins, Donahoe, and Johnson are collectively referred to herein as the "Director Defendants."

32.     The Director Defendants along with the Securities Action Defendants are referred to collectively herein as the "Individual Defendants."

33.     The Individual Defendants along with PayPal are known collectively as the "Defendants."

**D.      Related Party Non-Defendants**

34.      Related Party Non-Defendant Alyssa Henry ("Henry") has been a member of the Board since March of 2026. Henry is named solely for the purpose of demand futility.

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

35.     By reason of their positions as officers, directors, and/or fiduciaries of PayPal, and because of their ability to control the business and corporate affairs of PayPal, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage PayPal in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of PayPal and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.     Each director and officer of the Company owes to PayPal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

37. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

38. Pursuant to the Audit Committee Charter of PayPal (amended as of February 2, 2026)[3], the purpose of the Audit Committee is described as follows:

> The Audit and Finance Committee (the "Committee") shall provide assistance and guidance to the Board of Directors (the "Board") of PayPal Holdings, Inc., a Delaware corporation (the "Company"), in fulfilling its oversight responsibilities to the Company's stockholders with respect to (i) the Company's corporate accounting and financial reporting practices and the audit of the Company's financial statements, (ii) the independent auditors' qualifications and independence, (iii) the performance of the Company's internal audit function and independent auditors, (iv) the quality and integrity of the Company's financial statements and reports, (v) reviewing and approving all audit engagement fees and terms, as well as all non-audit engagements with the independent auditors, (vi) producing the report that the rules of the Securities and Exchange Commission ("SEC") require to be included in the Company's annual proxy statement; and (vii) various finance matters. In discharging these obligations, the Committee shall maintain and foster an open avenue of communication between the Committee and the independent auditors, the Company's management and internal auditors.

39. Concerning "Financial reporting principles and policies and internal controls and procedures", the Audit Committee Charter states:

> (a) Consider and discuss with the independent auditors any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Committee by the independent auditors required by applicable accounting standards;
>
> (b) Confer with the independent auditors, the internal audit team and senior management in separate executive sessions to discuss any matters that the

---

[3] Available at https://s205.q4cdn.com/875401827/files/doc_governance/2026/03/Audit-and-Finance-Committee-Charter_2026_FINAL.pdf.

Committee, the independent auditors, the internal audit team or senior management believe should be discussed privately with the Committee;

(c)     Review with the Company's Chief Legal Officer and Chief Risk Officer, as applicable, any significant legal, compliance or regulatory matters that could have a material impact on the Company's financial statements, business or compliance policies, including material notices to or inquiries received from governmental agencies;

(d)     Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

(e)     Discuss the types of financial information and earnings guidance (including the use of "pro forma," "adjusted" or other non-GAAP financial measures), and the types of presentations made, to analysts and rating agencies;

(f)     Discuss disclosure of key performance metrics, including how the measures are calculated or determined, whether they are consistently prepared and presented and the Company's disclosure controls and procedures related to disclosure of such measures;

(g)     Establish hiring policies for employees and former employees of the independent auditors. These policies shall provide that no former employee of the independent auditors may become the Chief Executive Officer; Chief Financial Officer; Senior Vice President, Internal Audit; Chief Accounting Officer; or Controller (or serve in a similar capacity) for one year following the issuance of the opinion of an audit of the Company in which such person participated in any capacity;

(h)     Discuss with the independent auditors and management the internal audit department responsibilities, budget and staffing and any recommendations regarding the internal audit department;

(i)     Review the significant findings to management prepared by the internal audit department and management's responses; and

(j)     Review and discuss earnings press releases.

40.     Concerning "Reporting and recommendations", the Audit Committee Charter states:

a)     Prepare the report of the Committee and any other disclosures required by the rules of the SEC to be included in the Company's annual proxy statement and

10

recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K;

(b)    Report to the Board on a regular basis and from time to time or whenever it shall be called upon to do so, and make recommendations to the Board as described in this charter and with respect to other matters as the Committee may deem necessary or appropriate;

(c)    Consider any reports submitted to the Committee by the independent auditors required by any applicable law or regulation;

(d)    Meet with management, the independent auditors and, if appropriate, the Chief Accounting Officer to discuss: the scope of the annual audit, the audited financial statements and quarterly financial statements including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal audit department or the independent auditors, relating to the Company's financial statements, any restrictions on the scope of the independent auditors' activities or access to requested information, and any significant disagreements with management; any critical audit matters; any "management letter" or "internal control" letter issued, or proposed to be issued; any major issues regarding accounting principles and financial statement presentations, including any significant changes to the Company's auditing and accounting principles, policies, controls, procedures and practices, and any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

(e)    Inquire of the Company's Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies in the design or operation of the Company's internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

41.    Concerning "Finance", the Audit Committee Charts states:

(a)    Periodically review the Company's capital structure and strategies, and take such action and make such reports and recommendations to the Board as it deems advisable;

(b)    Review the terms and conditions of material financing plans, including the issuance securities, corporate borrowings, securities repurchases and dividend policy, and make recommendations to the Board on such financing plans;

(c)    Review significant capital investments, real estate transactions, and other similar financial commitments;

(d)    Review acquisitions and dispositions of businesses or assets, joint ventures, and strategic investments, including the financial performance of such transactions;

(e)    Review the Company's treasury activities (including with respect to investments, cash management, foreign exchange and derivatives) and related risks; and

(f)    Review the Company's tax strategies, policies and risks.

42.    Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### Duties Pursuant to the Company's Code of Conduct

43.    The Individual Defendants, as officers and/or directors of PayPal, were also bound by the Company's Code of Business Conduct and Ethics (the "Code")[4] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of PayPal, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

44.    Concerning the responsibilities imposed by the Code, the Code states the following under the title "Responsibilities of Employees":

---

[4] Available at https://s205.q4cdn.com/875401827/files/doc_governance/2026/04/2026-Code-of-Business-Conduct-Ethics_external.pdf.

**Act Ethically and Responsibly**

We use good judgment and act in accordance with applicable laws, the Code, and Company policies. Our Code and policies provide guidance to perform your job ethically, responsibly, and in compliance with the law.

**As an employee, you are expected to:**
- Review the Code and Company policies and understand the laws that apply to your work.
- Always be honest and fair in your business dealings, internally and externally.
- Use good judgment, act in the best interests of PayPal, and seek guidance when you need it.
- Speak up and report suspected violations of the law, the Code, or Company policies.
- Encourage open communication free from the threat of retaliation.
- Complete your annual Compliance training.

**Reporting criminal arrests, indictments, charges, and convictions:**
- Any employee must, within 72 hours, disclose any criminal arrests, indictments, charges, and convictions to their local Employee Relations Manager.
- The criminal arrest, indictment, charge, or conviction may lead to corrective action, including termination, subject to PayPal policy.
- Failure to disclose, where legally permitted, and within the required 72-hour timeframe may lead to corrective action, including termination.
- Employees are required to cooperate with any review.

The above requirements apply to all PayPal employees unless otherwise provided by applicable law.

**Make Ethical Decisions**

When you face difficult decisions at PayPal, take the time to think and consider the legal and ethical issues. Don't give in to pressure and don't rush decisions. Take the time you need to make the right decision and consider the implications of your actions.

Pause before you act and reflect on your decision:
- Is it consistent with the law, our Code, policies and Leadership Principles?
- Is it honest and fair?
- Would you feel comfortable reading about your decision or action if it were reported in the media?

**Accountability**

13

We are all accountable for our actions and for behaving ethically and responsibly. This accountability applies to our actions at work as well as to activities outside of the workplace, including on social media and when socializing with colleagues, vendors, or business partners, regardless of whether PayPal covers the cost of the social activity.

Employees who violate the Code, Company policies, or the law may be subject to disciplinary actions, including termination, in accordance with PayPal policies and procedures and local employment laws.

45.     Concerning reporting, the Code states:

**Speak Up**

We are all empowered to speak up and report concerns or misconduct. Our commitment to fostering an ethical culture in which everyone is encouraged to voice their perspectives and concerns is the foundation of PayPal's success. If something does not feel right, each of us is empowered to speak up without the fear of retaliation. When you see or suspect misconduct, including suspected violations of the Code, Company policies, or the law, speak up promptly. All reported concerns about perceived misconduct are reviewed and investigated.

\*     \*     \*

**Resources**
We provide multiple safe and easy-to-use channels and resources for you to seek advice, speak up or get support. Listed alphabetically, these include:

- Business Ethics Officers (BEO)
- Community Compass
- Company policies
- People Hub
- Integrity Helpline
- Information Security
- Legal
- Ombuds/Ethics and Anti-Corruption team
- Employee Relations
- Risk and Compliance
- Your manager

46.     Concerning maintaining the accuracy of records, the Code states:

**Maintaining Business Records**

You are responsible for maintaining official business records in accordance with the Company's records management-related policies and records retention schedules.

14

This requires:

- Recording and reporting financial and other regulatory or compliance data without misleading, misrepresenting, misinforming, or omitting material information.

- Preserving all documents relevant to accounting, financial, and regulatory reporting, litigation, government investigations, or internal/external audits until otherwise notified by Legal.

- Disposing of business records that no longer need to be retained for business reasons, subject to Company policies and local regulations.

Consult PayPal's Enterprise Records and Information Governance Policy for more information.

**Accurate Accounts and Records**

We have an obligation to our regulators, shareholders, customers, and employees to ensure that our accounts and business records are complete and accurate. Timely preparation of accurate business records is critical for internal decision-making, provides evidence of our adherence to our policies and procedures, and serves as the foundation for our reporting to regulators and investors. Maintaining accurate records is consistent with our values and critical in maintaining our reputation for conducting all our business with integrity.

Key reminders:

- You must never falsify, forge, backdate, mischaracterize, improperly alter, or omit material information from any Company document or other business records.

- You must ensure that all transactions are lawful and executed in accordance with all Company policies, procedures, and internal controls.

- We must make complete, accurate, transparent, and timely disclosures to regulatory authorities and investors.

We are all collectively responsible for fulfilling this obligation.

47.    Concerning communications with the public, the Code states:

**Public Speaking**

We speak with one voice when communicating about PayPal. Inaccurate or misleading statements can create serious risks for the Company. Therefore, you should refrain from speaking on the Company's behalf unless you are authorized

15

to do so. PayPal's External Speaker Guidelines provide clear direction on who can speak on behalf of PayPal and when they are permitted to do so. You must obtain prior approval before speaking on PayPal's behalf in any public setting. You can initiate the approval process by engaging the Speakers Bureau.

**Advertising and Marketing**

We are committed to making sure that communications about our Company are accurate and reflect the Company's views and values. We research and document every claim in our advertisements and marketing materials prior to publication to ensure they are accurate, objective, and verifiable. Only employees who are authorized, or individuals who are engaged to speak on PayPal's behalf, may do so. We do not make false or misleading claims. Legal can provide guidance if you are unsure whether a particular claim may be perceived as inaccurate or misleading.

**Marketing on Social Media**

Advertising and marketing using social media are subject to various regulations. Please consult our Employee Guide for External Communications, Social Media, and Internal Collaboration Tools or Legal for more information. You can also contact Corporate Communications and the Social Media team with any questions. Social media marketing should be reviewed by the Marketing Legal team, and the content should be entered in MRF, our marketing review tool.

**Public Statements and Endorsements**

All public statements, endorsements, or information about PayPal, our products, or our business prospects must be approved in advance by Corporate Communications. Questions related to the Company's financial and operational performance must be directed to Investor Relations.

48.    Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

49.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of PayPal, were able to, and did, directly and/or indirectly, exercise

16

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by PayPal.

50.     Because of their advisory, executive, managerial, and directorial positions with PayPal, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of PayPal.

51.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of PayPal and was at all times acting within the course and scope of such agency.

## Reasonable and Prudent Supervision

52.     To discharge their duties, the officers and directors of PayPal were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of PayPal were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

17

(d) remain informed as to how PayPal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that PayPal was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

53.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to PayPal and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of PayPal, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of PayPal, the absence of good faith on their part, and a reckless disregard for their duties to PayPal and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to PayPal.

54.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

55.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, PayPal has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

58.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

59.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

19

commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

61.     PayPal is an international company whose primary business is facilitating digital payments between and amongst consumers and merchants. PayPal generates the majority of its revenue by imposing fees on the transactions facilitated by its digital payment services.

62.     An important performance metric for PayPal is total payment volume ("TPV"), which is the total value of the payments completed on PayPal platforms. TPV is closely connected to PayPal's revenue because greater TPV typically leads to greater transactions fees.

63.     Perhaps PayPal's most important business segment is its Branded Checkout segment, which encompasses platforms such as PayPal and Venmo. The Branded Checkout segments affords customers the ability to complete digital transactions without constantly re-entering payment information, and also offers "buy now, pay later" options.

64.     As of December 31, 2025, the Company's network possessed 439 million active accounts throughout roughly 200 markets. In 2025, the Company processed $1.79 trillion of TPV. TPV refers to the value of payments (net of payment reversals) successfully completed on a platform and serves as one of the metrics used by the Company to determine its platform scale and the relevance of its products and services.

### Materially False and Misleading Statements and/or Omissions

20

65. On February 8, 2024, the day after PayPal announced its results for the fiscal year and fourth quarter of 2023, Defendants made the following statement pertaining to the Branded Checkouts segment during an earnings call:

> *To start, we redesigned our branded checkout experience, creating more simplicity and consistency with the goal of optimizing presentment, increasing speed and minimizing friction across all major checkout flows. When combined with our efforts in password less authentication, these new flows can result in up to an additional 50% drop in latency, allowing a shopper to checkout twice as fast. Improvements like this are aimed at driving a higher selection rate of PayPal and better conversion for our merchants.[5]*

66. On March 4, 2024, during the Morgan Stanley Technology, Media & Telecom Conference, Defendants claimed that "our branded checkout is healthy, it's growing."

67. On March 13, 2024, during the Wolfe Fintech Forum, Defendants claimed "branded checkout is growing healthily," and "we continue to think that branded will grow healthily."

68. On July 30, 2024, Defendants published PayPal's results for the second quarter of fiscal year 2024. During the corresponding earnings call, Defendants made the following statements regarding Branded Checkout and the Company's business outlook:

> *We're encouraged to see not only the strength and stability in PayPal's platform, but also early contributions from some of the initiatives we have underway. Branded checkout continues to grow profitably.*
>
> . . .
>
> *Within branded checkout, we continue to see strength across large enterprise platforms, marketplaces and international growth.*

69. On October 29, 2024, Defendants published PayPal's results for the third quarter of fiscal year 2024. During the corresponding earnings call, Defendants made the following statements regarding Branded Checkout and the Company's business outlook:

---

[5] All emphasis added unless otherwise indicated.

*I'm proud of our team's innovation velocity as we reestablish ourselves as the best converting branded experience for consumers and merchants.*

*. . .*

*Maybe something we haven't connected the dots on well enough is all of the innovation that we're doing with Fastlane and with PayPal Everywhere and with what I talked about in my remarks on branded checkout, it all comes back to that durable branded checkout growth, right? PayPal Everywhere, we're starting to see real habituation of people not just getting access to the offline checkout, but also now bringing that back into online. So, all of this is driving back branded checkout growth. . . . What I'd say is branded checkout has been very consistent. We are, again, the largest, best converting and most share of branded checkout anywhere in the world, and it has been consistent.*

70.    On February 4, 2025, Defendants published PayPal's results for the full year and fourth quarter of fiscal year 2024. During the corresponding earnings call, Defendants made the following statements regarding Branded Checkout and the Company's business outlook:

*I think it's really important to set our branded checkout strategy in context. First, as Jamie said, and I think we've been consistent throughout the year, we're excited about the innovations. I think we've been pretty prudent in the way that we have looked at a forward guide.*

*. . .*

*But if I just step back and think about the strategy, think about what we did in 2024, we really worked on innovation and what I would call just fixing the basics of branded checkout. As I described earlier, an improved product now in the hands of customers on both desktop and mobile, and we're now starting to see that scale.*

71.    On February 25, 2025, Defendants conducted their annual Analyst/Investor Day call. During the call, Defendants made a series of claims regarding PayPal's Branded Checkout business and business outlook:

*Well, we've committed from a guidance to grow greater than 5% in transaction margin in 2025. As we look out into 2027, we see high-single-digit growth for transaction margin.*

*. . .*

22

*We are maniacally focused and what you will hear throughout the rest of the day is our strategic imperatives that I laid out at our last earnings call are where our teams are focused and executing, and they are all in line with the vision that I just laid out. We will win checkout.*

. . .

Now what is really important is that if you look at this numbers, every start – every start that we have in this page shows *that every consumer product leads to checkout.* And that is a very important distinction for our strategy. *That's why it's both about having an amazing checkout experience, but it's also critical that we build and we nurture a consumer product ecosystem that drives engagement, that gives us more ways to monetize and that keeps reinforcing selection.*

. . .

*So, I know you're all interested in understanding our growth expectations for branded checkout. Our plan is to accelerate TPV growth to between 8% and 10% by 2027.*

*We will measure success by growing our new experience share to over 80%, growing Pay Later usage by more than 20% and growing pay with Venmo by more than 40% as you heard in Diego's section.*

*So, to summarize, we have a rigorous plan to drive checkout growth. We're reigniting consumer selection. We have reimagined checkout experiences and innovated with Fastlane. And those are highly performing to exceed merchant and consumer needs. And now, we're laser focused on scaling them across our global merchant base. When we talk to merchants, they are impressed by our new experiences, which opens doors for having much more holistic conversations about how we help them driving their business.*

. . .

*Merchants typically enter to our ecosystem through branded checkout.* Then, they adopt processing and move to platform integration, which allows us then to add higher margin value-added services and new innovations. As you can see down there, we have a lot of upside.

. . .

I want to leave you with three takeaways. *We're raising the bar on branded checkout. We have an end-to-end plan to accelerate growth. Our new experiences are delightful for consumers and drive conversion and outcomes for merchants.*

23

. . .

Looking ahead, we have a diversified portfolio to drive growth. And what you see on this slide is a more simple and relevant TPV breakout than in the past. It's a better way of how we think about the product portfolio today, our customer needs and our use cases, and we're making progress across each of these areas. *So, the first online branded checkout includes PayPal branded checkout, eBay and Pay with Venmo, and it's about 30% of our TPV. We have a clear plan and execution milestones to accelerate and I'll talk about that more in a bit.*

. . .

I want to take a minute and walk you through some of the specific goals and ways for you to track our progress, underpinning each of the initiatives. *And starting with checkout, which is at the center of everything we do, our new products, partnerships, and campaigns are all aimed at accelerating checkout. We want to be the easiest, the fastest, the safest solution and it is essential we deliver more value to customers.*

. . .

*[W]e spend a lot of time benchmarking ourselves versus competition.* The first thing I'd say is we have to have a best-in-class experience for consumers. And that's what you saw today, which is -- and I've been very consistent. If you go back a year ago, that branded checkout experience, particularly on [mobile], as Frank walked through today was entering your e-mail, entering your password, it was very clunky. *And our ability to now leapfrog competition and ensure that we have the best-in-class consumer experience is step one.*

*But that is insufficient. I think if we are here three, four years from now talking about a frictionless checkout experience, we, as an industry, have failed.* This has to now turn into commerce experience. This has to turn into an experience, where you as a customer are getting a personalized checkout experience, just like you saw on screen today where I go into my store, I go to checkout, and I'm getting in our case, a button that is speaking to me. It knows me, it's personalized to me. It's giving me the right reward. It's understanding the loyalty that I have with this merchant.

*That, to me, is a completely different experience. And I think we are the only ones with a two-sided ecosystem with access to merchants at scale with access to 80 million-plus shopper profiles and access to hundreds of millions of consumers on an open agnostic platform to be able to deliver that next version of commerce.*

. . .

24

The way I think about it is, again, *if we change the game in how we engage with our merchants, branded checkout gets far more valuable for our merchants as well.* So, you're already starting to see things like habituation with Buy Now, Pay Later. Right, the increase in now bringing Buy Now Pay Later into the experience. *The uplift it gives for merchants is also economics for us as well.*

*But what we're starting to see is we're having merchant conversations, and I'm having many of these personally with CEOs of some of our largest merchants, is we are now able to bring them new customers.* And so, the people they're bringing into the conversation are their CMOs, are the people talking about customer acquisition. *And so, we're tapping into economics and the relationship that's beyond just their payments person or their checkout person.* And so, I just think, again, it's the biggest mindset shift that I asked you all at the beginning, and I will continue to ask you all to go through now, which is *the evolution of a payments company that is just focused on creating a frictionless checkout experience, which we are still the number one player in into a commerce company, and I think it just taps us into much broader addressable markets.*

. . .

[A] lot of what we're doing around branded checkout, driving debit, driving Buy Now, Pay later, driving Pay with Venmo, *these are all high-margin products in addition to the habituation and other halo effect they bring to branded. And we see that halo effect in the cohorts and in the numbers. And so, when you look at take rates, some of those do carry lower take rates, but they're margin accretive. And so, margin will be accelerating over the time as we do this, but at the same time, take rate may shift based on product mix and things like that.*

. . .

*Let me go back to the point about the shift on the mindset because we are moving from a value proposition that was only about checkout,* meaning a button, to a value proposition about PayPal, which means we want people to stay. We want consumers to stay in our ecosystem because there is a much larger equation of value from them when they do more with PayPal. *So, it starts with checkout. As we were saying before, now we are connecting the rest of the products from the ecosystem to check out like never before, from debit to pay later, to Pay with Venmo, even crypto now.*

. . .

*So, when you put all of this together, you're going to get so much value as a consumer that is going to be really compelling for you to stay with us.* On top of that, and you saw to the - what we did last September, our marketing is also changing to, number one, help you think differently about PayPal. It's not just for some purchases or just for online purchases, it's for all purchases. And that is a

25

massive change for the way the consumer thinks about PayPal, which in combination with the other things, is going to allow us to keep you super engage[d] with our brand.

. . .

I think the fact that we have both sides of the ecosystem gives us an opportunity to create completely differentiated experiences.

. . .

And so, when you think about a loyalty experience, I mean, everyone think back to the '90s when you had a thick wallet with a whole bunch of loyalty cards sitting in there. Those have gone away as you've now moved to a phone. But that also means that your relationship with your local merchant, your relationship with that loyalty platform has gone away as well. *I think we have an opportunity to bring that back. So that that consumer understands that, hey, this is where I make my purchases all the time. And this is where I want my rewards and my loyalty to be, and the merchant gets to have a deeper relationship with those consumers. And I think we have a very, very unique opportunity to create that flywheel.*

. . .

From a margin dollars perspective, *our guidance this year assumes 100 basis points of shift in margin.* And certainly, all the things I talked about are a part of that and a significant part of that. *Branded checkout, we're already at 30% penetration in the U.S. on the merchant experiences.* All the work Diego has done around offline, debit, marketing, that stuff you're going to see us continue and be very focused on as we move through 2025.

So what I'd say to that is it will be a gradation over the period of time is how to think about transaction margin. *When we come over to branded checkout, the U.S. side of it, we are very, very focused on U.S. growth with branded checkout. It is something that has the full weight of the organization behind it.*

72.    On April 29, 2025, Defendants published PayPal's results for the first quarter of fiscal 2025 year. During the corresponding earnings call (the "Q1 2025 Earnings Call"), Defendants made the following statements regarding Branded Checkout and the Company's business outlook:

In Q1, we delivered our fifth consecutive quarter of profitable growth, with transaction margin dollars growing by 8%, excluding the impact from last year's leap day. *That growth was driven by multiple sources across our strategic*

26

*initiatives, including omnichannel commerce, both online, branded checkout and off-line branded payment methods, Venmo and PSP*. As a result of this focus on profitability, non-GAAP earnings per share increased 23% year over year.

Additionally, PayPal and Venmo are being used by more people more often. Both total active accounts and monthly active accounts grew a healthy 2% in the quarter. Transactions per active account ex-PSP grew 4%, reflecting improved engagement and transaction growth in online branded checkout and Venmo.

As we expand our offerings from online to everywhere, *the best way to see the traction we're gaining is through branded experiences, TPV. Branded experiences comprises volume from PayPal and Venmo online checkout as well as branded in-store payment methods like debit and tap to pay.*

*In Q1, branded experiences TPV grew 8%, excluding last year's leap day. That's a full 2 points higher than branded experiences' growth for the full year of 2024, highlighting the growing contribution of our omnichannel initiatives. It's still early days, but we are very proud of this progress.*

Within branded experiences, we're continuing to accelerate the rollout of our upgraded online branded checkout flows. This includes our simplified and modernized paysheet design, with streamlined log-in and reduced latency. *Since the beginning of the year, we've driven a 25-point jump to more than 45% of U.S. checkout traffic. This shows we can execute, and we anticipate an even faster rollout for Europe starting in the second quarter.*

And finally, Venmo had another standout quarter. We hit an important inflection point for Venmo monetization, with 20% revenue growth, driven by our push to make Venmo one of the best ways to pay online and in-store.

*These are only a few examples of the strength we're seeing in the execution of our strategy. We're feeling the excitement of our innovations in the market and the engagement from our consumers and merchant partners, and we're just getting started.*

. . .

*Starting with win checkout. Online branded checkout TPV, including PayPal and Pay with Venmo, grew nearly 6% this quarter, accounting for last year's leap day. We're proud of this growth and expect it to increase over time as more traffic flows through our upgraded experience.*

. . .

27

Today, our PayPal and Venmo debit cards are enabling our customers to use their balance to shop anywhere cards are accepted. Adoption is strong and growing, with approximately 2 million first-time PayPal and Venmo debit card users in the quarter, an increase of nearly 90% from last year. Debit card TPV grew approximately 64% in the first quarter. Venmo debit card monthly active accounts grew nearly 40%, and penetration has reached to 6% of Venmo MAAs.

We are focused on getting these products into the hands of even more of our customers because they allow them to choose PayPal and Venmo as their way to pay more often. In the first quarter, users who adopted the PayPal debit card transacted nearly six times more and generated more than two times the average revenue per account, compared to those who used online branded checkout only. *There is also a halo effect where debit card users choose PayPal more often in online branded checkout.*

. . .

*In the first quarter, online branded checkout volumes grew more than 4% on a currency-neutral basis. And excluding last year's leap day, which contributed over 1 point to growth, online branded checkout volumes increased nearly 6%. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap to pay, grew 8% ex leap day, accelerating from the prior year.*

. . .

*Transaction revenue was flat on a spot basis or up 1% on a currency-neutral basis to $7 billion, driven primarily by branded checkout, Venmo and SMB processing.*

. . .

We've got -- this is the strategy that we've laid out really coming to light. So first, *we have a branded checkout strategy that is really about driving habituation everywhere that the customer wants to pay.* We have such strong brands in both PayPal and Venmo. And our customers are asking to be able to leverage that trust, the safety, the brand, the rewards in every purchase that they make.

*And so, we've been focused on not only improving that online experience that we've talked about, and I'm sure we'll talk about more, making it available for them exactly how they want to pay, whether that's immediately or with pay later scenario, with buy now, pay later, but then also offline.*

And you mentioned branded experiences. This really is enabling our PayPal debit card or our Venmo debit card to be accessible to our consumers. *We saw PayPal debit card TPV growth over 100% in Q1. And that really is driving habituation.*

28

*This is driving our consumers to actually start to come back, move online and start to pay with PayPal wherever they see it.*

*So, the strategy is working. TPV, up 8% overall in branded experiences. And this really is the metric that we are focused on and we hope you're focused on as well because, again, it is really all about the strategy that we've laid out.*

. . .

*[J]ust to unpack our branded strategy, I'd really think about it as 3 parts. One is the improved branded checkout experience. And as you mentioned, we've moved very quickly up now over 45% in the U.S.* Again, that still is -- think of that as sort of double digits of our global transactions. And so *we're really excited. We think we've got a really strong playbook now. And we think, as we start to roll this out into Europe, we'll actually accelerate even faster.* But our paysheet redesign is holding, the improvement is holding, and now this is just about scaling.

*Second lever is really accelerating Pay with Venmo,* and you've seen the results there. So very, very fast flywheel starting to happen from a Pay with Venmo perspective. TPV up over 50%, and MAAs up over 30%.

*And then the third lever is buy now, pay later and our pay later products.* And again, TPV up over 20%.

*So you add all three of those together, and as we continue to see us leaning into those three levers, I don't know the exact timing of when we'll start to see branded checkout, but we put pretty strong growth numbers of 8% to 10% by 2027.* And I think those 3 levers continue to give us confidence that we're executing well and heading in that direction.

. . .

*It is early, but we talked in the fourth quarter about seeing some shifting in our U.S. branded checkout levels. We saw that hold again this quarter, watching it very closely but cautiously optimistic about that.*

. . .

And I think what we're really excited about is that we're bringing our new product innovation to the market in Europe starting this quarter. *So we'll start with Germany and the U.K. And this is the checkout redesign.* It is buy now, pay later. It is omni and NFC launches. And brand marketing to accompany all of that, with a fast follow to other countries after that.

29

*So I think the overall look right now, we feel pretty good about branded checkout and just laser-focused on our execution.*

*. . .*

*Germany, we are really the market leader there. I think we're the number one brand in Germany for the last 3 years. So very, very strong consumer presence, very strong merchant presence.*

*It's also a different type of market. As I just mentioned, it was not a -- it's not a credit-heavy market. So the way PayPal is used is we're connected to bank, and then PayPal is used as really the way to make an online purchase. And so our transactions in e-commerce in Germany are extremely high. That's what gives us a lot of confidence as we now move into off-line, is we're really going to be really one of the first at-scale, bank-connected, off-line wallets that we think will be able to drive significant penetration into the market.*

So we're really excited about that as well as bringing some new innovations to market with not only our rewards program, but also the buy now, pay later connected element as well. *So with the brand presence we've got in Germany, with the banks already connected and the onboarding experience, that's just really delightful. I mean it's literally one click from your bank to be able to set up your off-line wallet. And with the innovation of rewards and buy now, pay later, we're really excited to get into the market there.*

*U.K., much more competitive dynamic there. We've really suffered in the last few years with what I would consider to be one of our poorest app experiences for consumers.* We're rolling out a new app experience in the U.K. shortly. But we've already started with, as you mentioned, the biometrics. So we actually got a favorable connection with the regulator there to enable us to enable our biometrics to be considered 2-factor authentication. That's rolling out quickly and enabling a much better experience, whereas before, it really was choppy and created a lot of friction and a lot of latency in the experience.

*Biometrics is now really creating a seamless experience. You add on top of that the new app that's going to be rolling out and then our rewards program and all the other innovation that we brought to bear. And we think we're going to be competing quite well in the U.K. And you'll see us leaning in from a go-to-market perspective as well to really remind consumers that we now have the best product in the market.*

73.    On July 29, 2025, Defendants published PayPal's results for the second quarter of fiscal year 2025. During the corresponding earnings call (the "Q2 2025 Earnings Call"),

Defendants made the following statements regarding Branded Checkout and the Company's business outlook:

> *We delivered our sixth consecutive quarter of profitable growth despite the macro uncertainty*. Transaction margin dollars grew 8%, excluding interest on customer balances. *Success across many of our strategic initiatives contributed to that growth, including online and off-line branded experiences, payment services and Venmo*. This highlights a healthy business with multiple avenues to sustain and accelerate growth, and non-GAAP earnings per share increased 18% year-over year. We continue to build upon our broad reach and strong engagement. Both total active accounts and monthly active accounts grew 2% in the quarter. Transactions per active account ex-PSP grew 4% as more people use PayPal and Venmo more often.
>
> *If we look at our four strategic growth drivers: winning checkout, scaling omni and growing Venmo, driving PSP profitability, and scaling our next-gen growth vectors, we are making meaningful and tangible progress on all four*. I'd like to walk through each one, highlighting examples of our progress. *The first two growth drivers are entirely focused on improving and growing our branded experiences. I'm proud that we drove 8% currency-neutral growth in branded experiences TPV this quarter. This positive result reflects the benefit of meeting our customers wherever they choose to shop with PayPal and Venmo, online and offline*. As a reminder, branded experiences includes winning checkout, expanding buy now, pay later, winning with Venmo and scaling omnichannel capabilities.
>
> Starting with online branded checkout. TPV, including PayPal, BNPL and Pay with Venmo, grew 5% currency neutral in the second quarter, consistent with what we've been seeing over the past year. *Our upgraded experiences are driving the uplift we expected, and most of our merchants and consumers are behaving consistently with recent quarters. At the same time, we offset headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs.*
>
> Our focus is on the things that are within our control and that we know will have a positive impact on our overall growth trajectory over time. That starts with driving more traffic through our upgraded checkout experiences, both in the U.S. and internationally. *These upgrades offer a much better consumer experience, improved presentment of BNPL and drive meaningful conversion rate improvements. This is currently rolling out in the U.S., Germany and the U.K., and we have a comprehensive playbook that we will apply to other countries.*
>
> . . .

31

Finally, I'd like to explain how last week's announcement of ***PayPal World will be a game changer for our branded experiences.***

. . .

For businesses, it means building the technology to accept dozens of wallets, which adds unnecessary costs and creates a fractured experience full of friction for customers, ultimately limiting reach and, of course, sales. When you want to sell to the world, how do you choose which wallets to accept and which customers to turn away? You shouldn't have to make that choice. ***This is where PayPal World comes in to make it simple and easy to connect any consumer with any merchant.*** Five of the largest digital wallets in the world, PayPal, Venmo, Mercado Pago, Tenpay Global and UPI are coming together on a seamless global platform. So you can now use your preferred wallet anywhere in the world.

***For our PayPal merchants, PayPal World will mean access to billions of new customers through their existing branded checkout integration.*** Now a UPI user in India who wants to buy a pair of sneakers from an online store in Germany that accepts PayPal can simply click the PayPal button at checkout and their familiar UPI button will be presented for them to complete the transaction. It's that simple. ***This means our connections for branded checkout will extend beyond our 400 million customers to more than 2 billion consumers worldwide, and that will continue to grow.***

. . .

***Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as Tap to Pay posted another quarter of 8% growth.***

While debit and tap-to-pay spend represent a smaller amount of volume in branded experiences today, they are growing rapidly and are up more than 60% year-over year. ***Winning checkout remains our most critical priority. Our teams are laser focused on advancing the many initiatives that reinforce our checkout business. In the second quarter, online branded checkout volumes grew 5% on a currency neutral basis.***

. . .

[T]hank you for the question, and I appreciate the comments on branded checkout. ***Look, we're excited as well. I think our execution on the global rollout, the U.S. rollout is exactly what we were looking for.*** And really, the cohorts that we now have live in market are delivering exactly the way we expected. ***To the comment on these platforms from Asia, the way we think about it is, without that pressure, our branded checkout really would have been at 6%.***

*And so, it's a small amount, but we've started to see it stabilize a little bit as we get into this month.*

. . .

I would just say that *our trends underlying all this really have been broadly consistent. There's puts and takes in any given quarter. And like Alex said, we did see a slight deceleration really in those Chinese to U.S. corridors*. In July, I would say it's still early, but seeing a bit less pressure in that space. *We plan the full year with branded checkout at mid-single digits. We are on track for that.* And the watch-out that I really – I am looking at is, we still have a fair amount of policy and macro uncertainty. So we're obviously monitoring that. *But we're very focused on our execution around our strategic initiatives.* And bending the curve takes time, and we expect to accelerate as we move through the next couple of quarters and the next couple of years.

. . .

*[W]e're very excited, and you can hopefully, you're seeing the pace of our innovation just continue to accelerate and sort of you're starting to see our whole strategy and the system that we're building together really play out.* Let me take each of those. So PayPal World - I think the easiest way to think about it in the short term is, a, what I'm really excited about is the interoperability between PayPal and Venmo. So now you've got a huge amount of Venmo customers that can click on the PayPal branded checkout and make their purchase online.

*Then we've opened it up to almost 2 billion additional users, and that will just continue to grow. And the best way to think about it is that's branded checkout.*

. . .

*On Pay with Crypto, we really do see this as, again, expansion of TAM at pretty attractive economics.*

. . .

So again, just to highlight, *we were very deliberate in our strategy to start our rollout of our new branded experiences in the U.S. We're up over 60% now in the U.S. And again, the cohorts that we've rolled out are continuing to operate in the way that we wanted and showing the uplift that we expected,* that we talked about in the past.

*We've now started to roll that out in the U.K. and Germany*. As I mentioned previously, those integrations typically are on newer integrations throughout Europe. And so I actually think *we're going to continue to accelerate our*

33

*adoption over the coming quarters across Europe. So very, very excited there.* We're mid teens overall on global TPV, and we want to see that continue to increase over the next few quarters.

. . .

*If you look at outside the U.S., again, we're really seeing largely consistent trends here. We continue to take share in Europe, including Germany. And as Alex mentioned, our broad push around our latest innovation, it's not just the latest experience, but it is buy now, pay later. It is the new app and app upgrades and the experience around that.* It's in its NFC, which we had a really successful rollout in the second quarter in Germany around that. *So it's all around branded checkout, really driving the habituation and the resulting halo that comes with that. And the teams are really focused on scaling that and pushing that as they go through.*

*With respect to accelerated rate, what I would tell you is that we are laser-focused on branded checkout. And I think as we talk about all of this, that focus on execution, the focus on the strategic initiatives, we fully expect to see an accelerated rate of growth over the next few quarters and the next few years.*

. . .

*[F]rom the cohorts that we've rolled this out to, and remember, this is 15% of global TPV, we're continuing to see the uplift that we've talked about, call it, one point of uplift. So that is going to continue.* We just need to roll this out to more. And so our expectation is if you look at branded checkout overall, it's this new branded experiences, it's the momentum that we've got in buy now, pay later, which we're seeing over 20% year-over-year growth. It's the improvement in Pay with Venmo, which we're seeing 45% year-over-year growth. All of those coming together, we continue to see momentum on.

*And so as we exit this year, I expect that we're going to start to see real improvement in branded checkout overall and then as we move into 2026. So this is a big shift. It takes time to move. I'm excited about the momentum we have across all three of those elements, the new experiences, buy now, pay later and Pay with Venmo. And I think we're going to start to see this thing turn as we get through the next few quarters and into 2026.*

74.    On October 28, 2025, Defendants published PayPal's third quarter 2025 results. During the corresponding earnings call (the "Q3 2025 Earnings Call"), Defendants made the following statements regarding Branded Checkout and the Company's business outlook:

34

*Thanks to our omnichannel initiatives, we've accelerated branded experiences TPV growth to be between 7% and 8% on a currency-neutral basis over the past four quarters.*

. . .

Put simply, this is the new PayPal, built for faster, more profitable growth. *Our strong foundation, differentiated competitive advantages and clear strategic direction position us to capture a massive and growing addressable market. With building execution momentum, we are driving innovation at a remarkable pace and scale. This makes us exceptionally well placed to win into the future.*

. . .

*We have the right set of drivers and initiatives in place. Now our focus is on adoption and investing to amplify our impact. As we move into 2026, we will be leaning more into these efforts and expanding across key international markets.*

Let me address online branded checkout in more detail. TPV grew 5% in the third quarter on a currency-neutral basis. *That solid growth, especially with the choppy global macro trends we continue to see this quarter. Given the competitive intensity online, we know more work is needed to close the gap between our performance and overall e-commerce growth.*

. . .

*I'm proud of the progress that we've made this quarter from partnerships to new product innovations, to continuing to strengthen our profitability.*

. . .

*The diversification and quality of this growth is a meaningful improvement from where we were at the start of the company's transformation. We have clear opportunities to build on this progress with investments that strengthen our competitive position and drive durable profitable growth.*

. . .

*We've moved branded experiences to the top of this slide to reflect the importance of this metric to our more expansive strategy and value creation*. Looking across the product portfolio, *we see encouraging signs that our initiatives are gaining traction and making an impact. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap-to-pay posted another quarter of 8% growth.*

. . .

35

*We remain focused on the initiatives we can control. We're confident in our branded checkout strategy and the road map that our teams are advancing. The early results in the U.S. demonstrate that we're on the right path with our initiatives*, including our redesigned experiences; buy now, pay later; and Pay with Venmo. *We're laser-focused on execution across the three key areas Alex discussed: scaling our redesigned experiences, improving prioritization and driving biometric adoption*. All of this is increasingly complemented by a compelling consumer value prop that differentiates PayPal and Venmo as one of the best, most rewarding ways to pay.

While this work is complex and takes time, *we fully expect to see our efforts build as we move through the next year and scale these initiative*s. Pay with Venmo and buy now, pay later continue to outpace the market, taking share from other payment methods, growing 40% and 20%, respectively. *These results give us the confidence to begin making targeted investments in the fourth quarter that amplify the impact of these and other initiatives throughout the portfolio.*

. . .

Following another quarter of strong financial performance, *we are raising our full year guidance for TM dollars and non-GAAP EPS*. For the fourth quarter, we expect currency-neutral revenue growth in the mid-single digits. *We expect fourth quarter TM to be between $4.02 billion and $4.12 billion, which represents about 3.5% growth at the midpoint. Excluding interest on customer balances, we expect TM dollars to grow by about 5% at the midpoint compared to 7% year-to-date.*

Setting interest rates aside, there are a few factors to highlight that impact our fourth quarter outlook. First, we have seen strong credit outperformance over the past year, driven by good execution from the team as well as a more benign loss environment. We expect to see year-over-year comparisons start to normalize more in the fourth quarter.

*Second, given the performance of some of our key initiatives, we see an opportunity to lean into our competitive differentiation with additional investment to drive faster growth over time*. In the fourth quarter, we will begin increasing investments designed to drive product attachment and habituation. Some of these investments are linked to volumes and, therefore, recorded as contra revenue impacting TM dollars and designed to drive additional growth over time.

Other growth investments such as global brand awareness campaigns, typically sit within marketing and non-transaction OpEx. Lastly, on TM, *our fourth quarter guide assumes some deceleration in branded checkout growth relative to our third quarter average. From a volume perspective, the most important weeks*

36

*and months of the quarter still lay ahead.* That said, *we are planning prudently given recent spending trends and the uncertain macro backdrop. We are also cognizant of lapping strong consumer spending in the fourth quarter of last year.*

. . .

*We are operating from a position of strength. The results you're seeing are proof that our strategy is working*. We built a more balanced, profitable growth engine across branded experiences, PSP and Venmo, and that's exactly what we set out to do. We're investing in high-impact growth initiatives that will move the needle and future-proofing the business with critical partnership, while simultaneously returning value to shareholders through our buyback program and our newly launched dividend. *We have moved this business from defense to offense, from stabilization to acceleration. We know exactly where the opportunities are, and we are laser-focused on executing our strategy.*

. . .

*We've had consistent mid-single-digit growth in branded checkout for multiple quarters now. And for the quarter, we've seen really good momentum across our growth initiatives with buy now, pay later, with Pay with Venmo. And we've seen continued U.S. growth at higher rates as well this quarter.*

*When we got into September, we began to see macro-related deceleration. And that is both in the U.S. and in Europe. And I talked about it in my prepared remarks, but really a relatively consistent number of transactions, but we're seeing basket sizes just trade down.* Average order value being down, particularly in retail where consumers are just being more selective. *And that behavior has continued into October. So obviously, it's really early in the fourth quarter. The holiday season is very back-end loaded. So it's something we're watching.* But we did call out, and you're right, *our guidance assumes a rate of growth lower than third quarter.*

*And so when you look at that macro and I pivot now to talking about the broader framework, we've seen very good progress. And I think what I'm most excited about is we know what's working, and we're really doubling down against that.* And Alex has talked a lot about buy now, pay later. We've talked a lot about Pay with Venmo. *And importantly, year-to-date in the U.S., our growth rates are higher than what we saw year-to-date last year in the U.S. So we're really seeing nice progress. But that macro piece of it, whether it's tariffs or some of this deceleration is offsetting our progress. And we set those 2027 targets, assuming a strong -- or assuming a consistent consumer macro environment. And ultimately, that's how we'll measure progress against that.*

*What I am excited about is we have scaled our initiatives in the U.S. first. And so where we see progress, we've got real confidence as we scale outside of the U.S. and internationally.*

*. . .*

*And look, I'm as impatient as anyone, I want to see this move as fast as we can. But we're talking about bending the curve on over $0.5 trillion of spend, and it's just taking time to get there. So we have confidence, as Jamie mentioned earlier, U.S. branded checkout is growing faster year-to-date than it did in 2024. So we know the experiences are working. We're now rolling it out in Europe. We expect that to continue through 2026. And in the meantime, we're leaning into BNPL growing north of 20%, Pay with Venmo growing north of 40%. And so we know that overall, in branded checkout, we're on the right path, it's just taking time.*

75.    The foregoing statements were materially false and misleading because Defendants failed to disclose that operational and execution issues were harming PayPal's Branded Checkout business because they failed to disclose that: (i) the Company's macroeconomic environment contained substantial risks; (ii) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (iii) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (iv) the Company failed to maintain internal controls.

**The Proxy Statements**

76.    On April 9, 2024, the Company filed its 2024 annual proxy statement (the "2024 Proxy Statement"). Defendants Chriss, Christodoro, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, Year, Adkins, and Donohoe solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

77.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (i) re-elect Defendants Chriss, Christodoro, Dorman, Lores, McGovern, Messemer, Moffett,

38

Sarnoff, Yeary, Adkins, and Donohoe to the Board; (ii) approve, on advisory basis, the compensation for the Company's named executive officers; (iii) approve an amendment to the Amended and Restated 2015 Equity Incentive Plan (the "2024 Amendment of the 2015 Equity Incentive Plan"); and (iv) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent auditor for 2024.

78.     The 2024 Proxy Statement states that the 2024 Amendment of the 2015 Equity Incentive Plan would, *inter alia*, increase the aggregate number of shares of common stock available for grant by 20 million shares. The 2024 Proxy Statement states that, as of March 15, 2024, 26,637,589 shares were still available for grant, meaning that if the 2024 Amendment of the 2015 Equity Incentive Plan is approved, the Company will have approximately 46,673,589 shares available for grant. The 2024 Proxy Statement identifies that under the 2024 Amendment of the 2015 Equity Incentive Plan, "[a]wards may be granted to employees, directors and consultants of the Company and employees and consultants of any subsidiary of the Company." The 2024 Proxy Statement states that if the 2024 Amendment of the 2015 Equity Incentive Plan is not approved, the Company's incentive plan would continue to be administered in its current form.

79.     Regarding "Risk Oversight," the 2024 Proxy Statement stated the following:

PayPal operates in approximately 200 markets globally in a rapidly evolving environment characterized by a heightened regulatory focus on all aspects of the payments industry. Accordingly, our business is subject to the risks inherent in the payments industry generally. A sound risk management and oversight program is critical to the successful operation of our business and the protection of our Company, customers, employees and other stakeholders. Management is responsible for assessing and managing risk and views it as a top priority. The Board is responsible for overall risk assessment and management oversight and executes its responsibility as a group and through its committees, which report at least quarterly to the full Board. The Board and its Committees consult with external advisors, including outside counsel, consultants, auditors and industry

experts, to help ensure that they are well informed about the risks and opportunities pertinent to the Company.

In addition to their ongoing oversight responsibilities, throughout 2023, the Board and its committees regularly reviewed and discussed with management the implications of geopolitical instability, supply chain shortages, higher inflation and rising interest rates and macroeconomic uncertainty. As part of these reviews, the Board considered management's ongoing strategies and initiatives to respond to and mitigate the adverse effects of geopolitical instability and macroeconomic conditions.

80.    Regarding the Code of Business Conduct and Ethics, the 2024 Proxy Statement

stated the following:

Our credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, executive officer and employee. PayPal's Code of Business Conduct and Ethics ("Code of Conduct") requires that our directors, executive officers and all other employees disclose actual or potential conflicts of interest and recuse themselves from related decisions. Directors, executive officers and other employees are expected to avoid any activity that is or has the appearance of being a conflict of interest with the Company. This includes refraining from engaging in activities that compete with, or are adverse to, the Company, or that interfere with the proper performance of an individual's duties or responsibilities to the Company. In addition, our Code of Conduct prohibits the use of confidential company information, company assets or position at the Company for personal gain.

We regularly review our Code of Conduct and related policies to ensure that they provide clear guidance. Additionally, to foster a strong culture of compliance and ethics, we conduct local outreach and awareness sessions, as well as annual risk and compliance training for all employees and contractors, which covers areas such as our Code of Conduct, anti-money laundering, information protection awareness, data privacy, safety and security and sexual harassment prevention. In addition, upon joining PayPal and annually thereafter, our employees must certify that they understand and will comply with our Code of Conduct. In 2023, PayPal achieved 100% completion for its annual risk and compliance training for the eighth consecutive year.

Concerns about accounting or auditing matters or possible violations of our Code of Conduct should be reported under the procedures outlined in our Code of Conduct. We also provide a global Integrity Helpline, which is available 24 hours a day, seven days a week in multiple languages. Reports to the Integrity Helpline are confidential and can be made anonymously.

40

81.    Defendants Chriss, Christodoro, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, Yeary, Adkins, and Donohoe caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*: (i) the Company's macroeconomic environment contained substantial risks; (ii) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (iii) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

82.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (i) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

83.    As a result of Defendants Chriss, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (i) re-elect Defendants Chriss, Christodoro, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, Yeary, Adkins, and Donohoe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (ii) approve, on advisory basis, the compensation for the Company's named executive

officers; (iii) approve the 2024 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future; and (iv) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent auditor for 2025.

84.    As the result of shareholders voting to approve the 2024 Amendment of the 2015 Equity Incentive Plan, an additional 20 million shares were made available for grant.

85.    On April 21, 2025, the Company filed its 2025 annual proxy statement (the "2025 Proxy Statement"). Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

86.    The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (i) re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board; (ii) approve, on advisory basis, the compensation for the Company's named executive officers; (iii) approve an amendment to the Amended and Restated 2015 Equity Incentive Plan (the "2025 Amendment of the 2015 Equity Incentive Plan"); and (iv) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent auditor for 2025.

87.    The 2025 Proxy Statement states that the 2025 Amendment of the 2015 Equity Incentive Plan would, *inter alia*, increase the aggregate number of shares of common stock available for grant by 15 million shares. The 2025 Proxy Statement states that, as of April 9, 2025, 31,711,814 shares were still available for grant, meaning that if the 2025 Amendment of the 2015 Equity Incentive Plan is approved, the Company will have approximately 46,711,814 shares available for grant. The 2025 Proxy Statement identifies that under the 2025 Amendment of the 2015 Equity Incentive Plan, "[a]wards may be granted to employees, directors, and

consultants of the Company and employees and consultants of any subsidiary of the Company on the basis of their service." The 2025 Proxy Statement states that if the 2025 Amendment of the 2015 Equity Incentive Plan is not approved, the Company's incentive plan would continue to be administered in its current form.

88.     Regarding "Risk Oversight," the 2025 Proxy Statement stated the following:

PayPal operates in approximately 200 markets globally in a rapidly evolving environment characterized by a heightened regulatory focus on all aspects of the payments industry. Accordingly, our business is subject to the risks inherent in the payments industry generally. A sound risk management and oversight program is critical to the successful operation of our business and the protection of our Company, customers, employees, and other stakeholders. Management is responsible for assessing and managing risk and views it as a top priority. The Board is responsible for overall risk assessment and management oversight and executes its responsibility as a group and through its committees, which report at least quarterly to the full Board. The Board and its Committees consult with external advisors, including outside counsel, consultants, auditors, and industry experts, to help ensure that they are well informed about the risks and opportunities pertinent to the Company.

89.     Regarding the Code of Business Conduct and Ethics, the 2025 Proxy Statement stated the following:

Our credibility and reputation depend upon the good judgment, ethical standards, and personal integrity of each director, executive officer and employee. PayPal's Code of Business Conduct and Ethics ("Code of Conduct") requires that our directors, executive officers, and all other employees disclose actual or potential conflicts of interest and recuse themselves from related decisions. Directors, executive officers and other employees are expected to avoid any activity that is or has the appearance of being a conflict of interest with the Company. This includes refraining from engaging in activities that compete with, or are adverse to, the Company, or that interfere with the proper performance of an individual's duties or responsibilities to the Company. In addition, our Code of Conduct prohibits the use of confidential company information, company assets or position at the Company for personal gain.

We update our Code of Conduct and related policies annually to ensure that they provide clear guidance and align with market practice and evolving legal/regulatory changes. Additionally, to foster a strong culture of compliance and ethics, we conduct local outreach and awareness sessions globally, as well as annual risk and compliance training for all employees and contractors, which

covers areas such as our Code of Conduct, anti-money laundering, information protection awareness, data privacy, anti-corruption, safety and security, and sexual harassment prevention. In addition, upon joining PayPal and annually thereafter, our employees must certify that they understand and will comply with our Code of Conduct. In 2024, PayPal achieved 100% completion for its annual risk and compliance training for the ninth consecutive year. Any amendments or waivers to our Code of Conduct requiring disclosure under applicable SEC or Nasdaq rules will be posted on our website.

Concerns about accounting or auditing matters or possible violations of our Code of Conduct should be reported under the procedures outlined in our Code of Conduct. Among our many safe, easy-to-use reporting channels we provide a global Integrity Helpline, which is available 24 hours a day, seven days a week in multiple languages. Reports to the Integrity Helpline are confidential and can be made anonymously.

90.     Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*: (i) the Company's macroeconomic environment contained substantial risks; (ii) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (iii) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

91.     The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (i) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (ii) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately

44

exercising these functions and were causing or permitting the Company to issue false and misleading statements.

92. As a result of Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (i) re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (ii) approve, on advisory basis, the compensation for the Company's named executive officers; (iii) approve the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future; and (iv) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent auditor for 2025.

93. As the result of shareholders voting to approve the 2025 Amendment of the 2015 Equity Incentive Plan, an additional 15 million shares were made available for grant.

### The Truth is Revealed

94. The truth was revealed on February 3, 2026, when the Company issued its Q4 2025 Earnings Press Release. The Q4 2025 Earnings Press Release stated the following, in pertinent part:

**4Q'25 Financial Results**
- Net revenues increased 4% to $8.7 billion; 3% currency-neutral ("FXN").
- Transaction margin dollars1 ("TM$") increased 3% to $4.0 billion; TM$ excluding interest on customer balances1,2 increased 4% to $3.7 billion.
- GAAP operating income increased 5% to $1.5 billion; non-GAAP operating income increased 3% to $1.6 billion.
- GAAP operating margin expanded 19 basis points to 17.4%; non GAAP operating margin contracted 9 basis points to 17.9%.
- GAAP EPS increased 38% to $1.533; non-GAAP EPS increased 3% to $1.23.

**FY'25 Financial Results**

- Net revenues increased 4% to $33.2 billion; 4% FXN.
- TM$1 increased 6% to $15.5 billion; TM$ excluding interest on customer balances1,2 increased 6% to $14.2 billion.
- GAAP operating income increased 14% to $6.1 billion; non-GAAP operating income increased 9% to $6.4 billion.
- GAAP operating margin expanded 154 basis points to 18.3%; non GAAP operating margin expanded 87 basis points to 19.2%.
- GAAP EPS increased 35% to $5.413; non-GAAP EPS increased 14% to $5.31.[6]

95.    Moreover, the Q4 2025 Earnings Press Release quoted Defendant Miller as stating the following:

> In 2025, PayPal delivered solid performance across multiple areas of the business. We grew revenue, transaction margin dollars, and earnings per share, underscoring the strength of our increasingly diversified platform. ***At the same time, our execution has not been where it needs to be, particularly in branded checkout. As announced today, the Board's appointment of Enrique Lores as PayPal's next President and CEO reflects a clear commitment to strengthening execution, innovation, and results.*** We are fully aligned on the path forward as PayPal enters its next chapter of growth.

96.    Also on February 3, 2026, the Company issued the February 2026 Transition Press Release. The February 2026 Transition Press Release announced the appointment of "Enrique Lores as President and CEO, effective March 1, 2026 … succeed[ing] Alex Chriss." The February 2026 Transition Press Release further noted that "[t]o ensure a seamless transition, Jamie Miller, Chief Financial and Operating Officer, will serve as Interim CEO until Lores assumes the role."

97.    Notably, the February 2026 Transition Press Release provided little detail on the abrupt termination of Defendant Chriss from his roles at the Company. However, the February 2026 Transition Press Release did note the following, in relevant part:

> Today's appointment follows a detailed evaluation conducted by the Board of Directors on the current position of the company relative to its competition and the broader industry landscape. ***While some progress has been made in a number***

---

[6] Emphasis in original.

*of areas over the last two years, the pace of change and execution was not in line with the Board's expectations.* The Board is confident that the appointment of Lores, a seasoned executive with more than three decades of technology and commercial experience, will provide the leadership necessary to lead PayPal into its next chapter.

98.    That same day, the Company hosted the Q4 2025 Earnings Call. During the Q4 2025 Earnings Call, Defendant Miller discussed the lackluster performance of the Company's Branded Checkout segment and the overall issues facing the Company, stating the following, in relevant part:

Last February, we held an Investor Day outlining our transformation strategy. One year later, there are elements working very well, but there are also areas pacing below our expectations, primarily within branded checkout, which I will spend much of my time discussing today.

. . .

Where we haven't made the same progress is in online branded checkout. We've reimagined a product that had been stagnant and underinvested in for years, creating a new value proposition for merchants and consumers, but *we were too optimistic about how quickly we could drive change and customer adoption across a massive global user base. The results are not yet where we expected them or want them to be. Let me update you on where we are, what is working and the steps we're taking to get back on track.*

For the past few years, we have delivered consistent mid-single-digit TPV growth. However, *in the fourth quarter, online branded checkout TPV grew 1% on a currency-neutral basis, down from 5% in the third quarter. The 4 point deceleration was more than we expected* and was concentrated in three main areas, each contributing roughly 1 point or so to the slowdown. First, U.S. retail weakness. We saw pressure across our retail merchant portfolio, particularly among lower and middle income consumers. *While part of this can be attributed to macro factors and a K-shaped economy, it's also clear that we need to do more to win with key merchants, particularly during high-volume shopping periods.*

Second, international headwinds particularly in Germany, which is one of our largest markets. *Our German growth has moderated due to macroeconomic softness, normalization of our long-standing market leadership position and competition from alternative payment methods.*

Third, deceleration in several high-growth verticals, specifically in travel, ticketing, crypto and gaming, categories that had strong growth in the fourth quarter of '24 and continuing through much of '25.

***Cutting across all of these, we had operational and deployment issues that amplified the pressure.*** To date, our delivery process has started with building a better product and expecting merchants to adopt at scale because of conversion benefits. ***The reality is our merchants, especially the largest ones, have many competing priorities and require much more hands-on integration support than we anticipated, which has slowed our progress.*** Additionally, the combination of biometric adoption and competitive presentment have proven critical to branded checkout performance.

So while challenges in the macro environment are real, ***we haven't executed as well as we need to, and our product deployment in the second half of the year was slower than we planned.***

. . .

First, a relentless focus on the highest impact merchants. ***To date, we've been optimizing for every merchant, and that approach has slowed our ability to move quickly on what matters most. We're changing our approach to focus on strategic merchants, representing nearly 25% of our branded checkout volume today but could be much larger.*** In January, we formed dedicated teams to implement improvements across experience, presentment and selection for these merchants.

Second, focus on implementing experience and biometrics together, not sequentially. ***In too many cases, we were deploying our redesigned checkout without biometric enablement, which does not deliver the full conversion lift we know we can provide. That's changing.*** We're now deploying experience and biometrics together as a package more consistently. When we integrate a merchant on to our latest experience, we will simultaneously run biometric adoption campaigns, targeting their consumer base.

. . .

Third is a focus on presentment. It is just as critical as experience. As I mentioned before, when we secure a competitive placement on a merchant site, we perform significantly better.

. . .

Fourth, a focus on giving consumers a reason to come back

. . .

*For branded checkout, our focus is on narrowing the gap with the market over time. Following our fourth quarter performance, we need to prove that out in coming quarters and years.* There are multiple ways for us to deliver profitable growth over the long term, and 2025 was a great example of that. But *given everything I've outlined, we are no longer committing to the specific outlook for 2027 we laid out at Investor Day last year.*

*For these reasons, we think it's prudent for now to provide financial guidance 1 year at a time.* And Steve will speak in more detail about how we're thinking about 2026 as a starting point. The strategy I outlined today focuses on three fundamentals: experience, presentment and selection. And *these critical changes to our go-to-market approach* will lay the groundwork for a stronger, more competitive online branded checkout business over time.

In closing, while we are confident in the plan to stabilize and strengthen it. Importantly, we are executing with multiple competitive advantages. Our scale, our trusted brand, deep consumer and merchant relationships and diversified growth drivers give us resilience and flexibility moving forward.

. . .

TM dollars excluding interest grew 4% in the fourth quarter. The drivers of that growth were broad-based, led by strong credit performance, PSP profitability, Venmo monetization and loss improvement across multiple products. This diversification *was key in offsetting the headwinds to branded checkout*

. . .

On an *online-only branded checkout basis, volume grew 1% on a currency neutral basis,* impacted by the factors that Jamie discussed in depth earlier. I'll talk more about how we are planning for the current year shortly.

. . .

As Jamie discussed, *we are no longer providing the specific multiyear growth outlook we presented at our Investor Day a year ago. As it relates to branded checkout, our prior outlook assumed a more stable e-commerce environment and a certain pace of product rollout and merchant adoption. Neither has materialized to date as we anticipated.* And while we can point to a number of constructive indicators, *it's hard to call the precise time frame when we will see an overall inflection for branded. Branded checkout represents over half our profit dollars,* and we're confident the product, channel and marketing investments we're making will drive improvement and acceleration over time.

49

99.    On this news, the price per share of the Company's common stock fell $10.63, or approximately 20.3%, from a closing price of approximately $52.33 per share at the close of trading on February 2, 2026 to close at $41.70 per share on February 3, 2026.

**<u>STOCK REPURCHASE ALLEGATIONS</u>**

100.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately ***$11 billion*** to repurchase approximately ***161.1 million shares*** of its own common stock at artificially inflated prices from April 2024 through December 2025.

101.    The Company's Quarterly Report on Form 10-Q filed with the SEC on April 30, 2024, discloses that, between March 1, 2024, and March 31, 2024, the Company repurchased 9.1 million shares for approximately $540.4 million at an average price of $59.39 per share.

102.    The Company's Quarterly Report on Form 10-Q filed with the SEC on July 30, 2024, discloses that, between April 1, 2024, and April 30, 2024, the Company repurchased 8.2 million shares for approximately $530.8 million at an average price of $64.73 per share. In addition, between May 1, 2024, and May 31, 2024, the Company repurchased 8.8 million shares for approximately $559.3 million at an average price of $63.56 per share. Finally, between June 1, 2024, and June 30, 2024, the Company repurchased 6.6 million shares for approximately $410.3 million at an average price of $62.17 per share.

103.    The Company's Quarterly Report on Form 10-Q filed with the SEC on October 29, 2024, discloses that, between July 1, 2024, and July 31, 2024, the Company repurchased 15.3 million shares for approximately $914.8 million at an average price of $59.79 per share. In addition, between August 1, 2024, and August 31, 2024, the Company repurchased 8 million

50

shares for approximately $536.1 million at an average price of $67.01 per share. Finally, between September 1, 2024, and September 30, 2024, the Company repurchased 4.4 million shares for approximately $323.2 million at an average price of $73.46 per share.

104. The Company's Annual Report on Form 10-K filed with the SEC on February 4, 2024, discloses that, between October 1, 2024, and October 31, 2024, the Company repurchased 6.5 million shares for approximately $519.5 million at an average price of $79.93 per share. In addition, between November 1, 2024, and November 30, 2024, the Company repurchased 7.1 million shares for approximately $595.5 million at an average price of $83.87 per share. Finally, between December 1, 2024, and December 31, 2024, the Company repurchased 1.2 million shares for approximately $103.9 million at an average price of $86.61 per share.

105. The Company's Quarterly Report on Form 10-Q filed with the SEC on April 29, 2025, discloses that, between January 1, 2025, and January 31, 2025, the Company repurchased 5.9 million shares for approximately $521.5 million at an average price of $88.39 per share. In addition, between February 1, 2025, and February 28, 2025, the Company repurchased 6.4 million shares for approximately $491.9 million at an average price of $76.86 per share. between March 1, 2025 and March 31, 2025, the Company repurchased 7.1 million shares for approximately $491.8 million at an average price of $69.27 per share.

106. The Company's Quarterly Report on Form 10-Q filed with the SEC on July 29, 2025, discloses that, between April 1, 2025 and April 30, 2025, the Company repurchased 8.3 million shares for approximately $516.6 million at an average price of $62.24 per share. In addition, between May 1, 2025 and May 31, 2025, the Company repurchased 7.3 million shares for approximately $515.2 million at an average price of $70.57 per share. Finally, between June

1, 2025 and June 30, 2025, the Company repurchased 6.5 million shares for approximately $470.5 million at an average price of $72.39 per share.

107. The Company's Quarterly Report on Form 10-Q filed with the SEC on October 28, 2025, discloses that, between July 1, 2025 and July 31, 2025, the Company repurchased 7 million shares for approximately $523.3 million at an average price of $74.75 per share. In addition, between August 1, 2025 and August 31, 2025, the Company repurchased 7.3 million shares for approximately $502.6 million at an average price of $68.85 per share. Finally, between September 1, 2025 and September 30, 2025, the Company repurchased 7 million shares for approximately $475.4 million at an average price of $67.92 per share.

108. The Company's Annual Report on Form 10-K filed with the SEC on February 3, 2026, discloses that, between October 1, 2025 and October 31, 2025, the Company repurchased 7.8 million shares for approximately $547.6 million at an average price of $70.20 per share. In addition, between November 1, 2025, and November 30, 2025, the Company repurchased 7.1 million shares for approximately $453.1 million at an average price of $63.81 per share. Finally, between December 1, 2025 and December 31, 2025, the Company repurchased 8.2 million shares for approximately $499.5 million at an average price of $60.91 per share.

109. Since the value of the Company's stock during the Relevant Period was actually $41.70 per share, the price at closing on February 3, 2026, Defendants caused the Company to overpay for repurchases of its own stock by approximately *$4.3 billion* throughout the Relevant Period.

## DAMAGES TO THE COMPANY

110.    PayPal has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, PayPal has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a.  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b.  costs incurred from the Company's stock repurchases made during the Relevant Period;

c.  substantial loss of market capital;

d.  costs already incurred and to be incurred defending the Related Securities Action; and

e.  any fines or other liability resulting from the Company's violations of federal law.

111.    In addition, PayPal's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

112.    The wrongdoing complained of herein has irreparably damaged PayPal's corporate image and goodwill. For at least the foreseeable future, PayPal will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that PayPal's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

113.    Plaintiff brings this action derivatively in the right and for the benefit of PayPal to redress injuries suffered, and to be suffered, by PayPal as a direct result of violations of federal

securities laws by the Defendants. PayPal is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

114.    The Board of PayPal, at the time this action was commenced, consisted of Defendants Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, Stanley, Yeary and Related Party Non-Defendant Henry a total of twelve (12) individuals.

115.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the PayPal Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

116.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

117.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Lores Because His
Principal Professional Occupation as the Company's CEO and President**

118.    Defendant Lores has been with the Company as President and CEO since March 1, 2026. Defendant Lores is also a member of the Board. As the CEO of the Company, it is reasonable to infer that, due to the importance of the Company's Branded Check out segment Defendant Lores would have been aware of: (i) the Company's macroeconomic environment contained substantial risks; (ii) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (iii) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (iv) the Company failed to maintain internal controls.. The Company does not claim that Defendant Lores is an independent director and because his primary source of income and primary employment is his employment as President and CEO of PayPal and his professional reputation is inextricably bound to his role at PayPal, Defendant Lores is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Audit Committee Defendants**

119.    Demand is futile as to Defendants Christodoro, Di Sibio, McGovern, Messemer, Moffett, and Yeary (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

120.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties of the Audit Committee are set forth herein, *supra*.

121.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that

55

the statements set forth above in the Company's public filings were materially false and misleading when made.

122.   The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information, including that: (i) the Company's macroeconomic environment contained substantial risks; (ii) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (iii) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (iv) the Company failed to maintain internal controls. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

## Demand is Futile as to the Director Defendants

123.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

124.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's

business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

125.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

126.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

**Against the Individual Defendants for
Violations of Section 14(a) of the Exchange Act**

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

129.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that

no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

130.    Under the direction and watch of the Individual Defendants, the 2024 and 2025 Proxy Statements failed to disclose that: (i) (i) the Company's macroeconomic environment contained substantial risks; (ii) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (iii) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (iv) the Company failed to maintain internal controls.

131.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the directors.

132.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 and 2025 Proxy Statements.

133.    Plaintiff on behalf of PayPal has no adequate remedy at law.

**COUNT II**

**Against the Securities Action Defendants for
Contribution Under Section 10(b) of the Exchange Act,
Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

134.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

135.    As a result of the conduct and events alleged above, PayPal has been named as a defendant in the Related Securities Action brought on behalf of PayPal shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

136.    Federal law provides PayPal with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, PayPal has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling PayPal to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

137.    Accordingly, Plaintiff, on behalf of PayPal, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with PayPal under Rule 10b-5, or if joined in such actions, would be liable for the same damages as PayPal.

138.     PayPal claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

139.    Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects.

These statements were materially misleading to persons who purchased PayPal securities during the Relevant Period.

140.     The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing PayPal securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

141.     The damages suffered by said investors were caused by reason of the fact that: (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

142.     The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

143.     When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of PayPal, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

144.     Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if PayPal were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on

behalf of PayPal.

**Allegations Regarding the Securities Action Defendants as Control Persons**

145.  In acting as alleged above, the Securities Action Defendants were acting as authorized agents of PayPal in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

146.  The Securities Action Defendants were "controlling persons" of PayPal within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

147.  Plaintiff hereby derivatively claims such right of contribution on behalf of PayPal.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

148.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.  The Individual Defendants owed and owe PayPal fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe PayPal the highest obligation of good faith, loyalty, and due care.

150.  The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to PayPal shareholders materially misleading and inaccurate information through the Company's SEC

61

filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

151. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused PayPal to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to PayPal and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

152. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

153. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## COUNT IV

### Against all the Individual Defendants for Unjust Enrichment

154. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of PayPal.

156. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to PayPal.

157. Plaintiff, as a shareholder and representative of PayPal, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and

other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

158.    Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Abuse of Control

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of PayPal and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

161.    As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

162.    Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VI

### Against the Individual Defendants for Gross Mismanagement

163.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164.    The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were

responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

165. Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

166. By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of PayPal's affairs and in the use and preservation of PayPal's assets.

167. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused PayPal to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to PayPal, thus breaching their duties to the Company.

168. As a result, the Individual Defendants grossly mismanaged PayPal and should be liable to the Company for the resulting damages.

**COUNT VII**

**<u>Against the Individual Defendants for Waste of Corporate Assets</u>**

169. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by

the Related Securities Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

171.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

172.    Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of PayPal and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to PayPal the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing PayPal and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PayPal and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2)    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.    Determining and awarding to PayPal exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.    Awarding PayPal restitution from Defendants, and each of them;

F.    Awarding PayPal Contribution from Securities Action Defendants, and each of them;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 3, 2026                                    Respectfully submitted,

**BIELLI & KLAUDER, LLC**

By: */s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Tel: (302) 803-4600
rernst@bk-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
**Hewlett, NY 11557**
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

66